In the Matter of Gina Bernice Bloise, a Child,
STATE EX REL JUVENILE DEPARTMENT OF
KLAMATH COUNTY et al, *Respondents,*
*v.*
BLOISE et ux, *Appellants.*
(No. 142-75, CA 5505)

552 P2d 858

*William B. Murray,* Portland, argued the cause for appellants. On the briefs was Glenn D. Ramirez, Klamath Falls.

*Janet Metcalf,* Assistant Attorney General, Salem, argued the cause for respondent Klamath County Juvenile Department. With her on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

*Alan M. Lee,* Klamath Falls, argued the cause for respondent Diana B. Barraco. With him on the brief was Smith & Lee, Klamath Falls.

Before Schwab, Chief Judge, and Fort and Lee, Judges.

LEE, J.

**LEE, J.**

This is a juvenile proceeding to determine the custody of Gina Bernice Bloise (Gina), a 10-year-old girl. The plaintiffs-respondents are the state, on the relation of a county juvenile department, and Diana B. Barraco (mother), Gina's natural mother. The defendants-appellants are Gina's paternal grandparents, George Bloise, Sr. (grandfather) and Dixie Bloise (grandmother), who were adjudged in contempt of court and required to forfeit a $7,500 bond.

Following petitions by the grandfather and a representative of the Children's Services Division (CSD), the court held a hearing on April 2, 1975. At the conclusion of that hearing, the court stated:

"It is the order of the Court that Gina Bernice Bloise be placed in the temporary care and custody of Children's Services Division;

"It is further ordered by the Court that the personnel of Children's Services Division make an investigation of the grandparent's home or any other place that they feel is proper to investigate, and if in their opinion it would be in her best interest to be placed elsewhere, they may do so, and

"It is further the order of the Court that whomsoever the child is placed with, if moved from where it is now, is refrained from removing the child from the State of Oregon and the jurisdiction of this Court. Violation of this order will be contempt of Court."

On or about April 6, 1975, the CSD placed Gina in the physical custody of the grandparents. On April 7, 1975, the court issued an Order of Detention in which Gina was

"* * * placed in the temporary custody, care and control of the Children's Services Division of the State of Oregon; and further that said Children's Services Division forthwith make a home evaluation of George Bloise and Dixie Bloise's home to determine if placement of said child with her grandparents would be in the child's best interests; and further that all persons are hereby restrained from transporting said child out of the County

[ 383 ]

of Klamath, State of Oregon, without further order of the court * * *."

The court further ordered

"* * * that prior to delivery of said child to George Bloise and Dixie Bloise they post bond herein in the amount of $1,500.00 conditioned upon their producing said child before the Court whensoever the Court shall so order * * *."

On May 9, 1975, the court issued an order as follows:

"IT IS HEREBY ORDERED, that the bond posted the 7th day of March, 1975 in the amount of $1,500.00 be, and the same is hereby raised to the amount of $7,500.00."

The $7,500 bond was posted on May 9, 1975.

On September 16, 1975, there was apparently (the record is not clear) a habeas corpus hearing before Judge Karaman brought by the mother in Jackson County to secure custody from the grandparents. Custody was awarded therein to the mother and appeal was taken to this court. We stayed the habeas corpus order on September 19, 1975, and we dissolved the stay on April 19, 1976.

On September 17 there was a visit between Gina and her mother, followed by a meeting in the chambers of Judge Piper. Present at the meeting were Lawson, a representative of the juvenile department, a representative from the district attorney's office, the attorney for the mother, the attorney for the grandparents, and the attorney for the child. Lawson testified concerning the purpose of the meeting:

"* * * This meeting was to determine whether or not or at least an understanding as to whether or not there would be an immediate transfer of custody from the Bloise's, Mr. Bloise Sr. to Mrs. Barraco and we discussed the possibility of placing Gina in a foster home, in foster care, under the supervision of my agency the Children's Services Division, for the purpose of helping Gina make the transition from the home where she had been living with [to] her natural mother who she had not lived with for a couple of years."

[ 384 ]

Lawson further testified that in the meeting:

"* * * The concensus as I recall it or I believe the outcome of that meeting was that Gina would be placed in foster care however Judge Piper wanted to have a copy of Judge Karaman's order before him when he signed the juvenile court order giving us authority to place Gina in foster care since he didn't have that, there was no authority for my agency to take custody of Gina and it was my understanding that it would be status quo namely that Gina would remain with the grandparents for the time being."

The meeting ended at about 6 p.m. Waiting outside during the meeting were the grandmother, the mother and Mrs. Wilson, who was Lawson's supervisor. Lawson learned from Mrs. Wilson that the grandmother found out from her attorney that the grandfather was at the attorney's office, so the grandmother left to go to that office, which was about three blocks away.

In cross-examination by the grandparents' attorney, Lawson stated:

"* * * [I]t's my understanding that when Mrs. Dixie Bloise left the Courthouse to go to your office and find her husband that Mrs. Wilson evidently asked her what to do with Gina and she said well she could stay with my daughter-in-law [stepmother of Gina].

"Q. And that was agreeable?
"A. That is my understanding, I didn't hear that with my personal ears.
"Q. That was agreeable with Pat Wilson?
"A. Yes, because it was dark.

At another point in his testimony Lawson stated:

"A. * * * She [the grandmother] told Mrs. Wilson and was related to me by Mrs. Wilson that the daughter-in-law Gina, the stepmother was waiting out in front in her car and and that we would leave Gina with her, excuse me, we went and we talked to the daughter-in-law Mrs. — Mrs. Wilson was standing off to one side and Gina got in the car and Mrs. Wilson told Gina that she could wait with Mrs. Bloise, Jr. for the grandmother— the grandmother would come back.

"Q. And what did you do?

"A. Mrs. Wilson—I walked back to our office because I had another appointment.

"Q. For the benefit of the Court our office—your office is one block from the Courthouse right across the street from my office?

"A. Yes.

"Q. And then what is your understanding from that point on?

"A. Okay, I left Mrs. Wilson there and she got her car and she tells me that she drove back by the Courthouse and Mrs. Bloise, Jr. with whom Gina was with was still waiting in front of the Courthouse as we instructed her to do to stay there for Mrs. Bloise, Sr. and as Mrs. Wilson drove up Mrs. and Mrs. Bloise, Sr. also drove up behind their daughter-in-law.

"Q. Is that the last contact then that you had with the Sr. Bloises, that contact that you have related to the Court?

"A. As far as I know, yes.

"Q. And as you understood from talking with Mrs. Wilson yesterday that would be her testimony if called as a witness although she couldn't be here today that she actually saw the Sr. Bloise's drive up behind the Jr. Bloise woman of [with] which you left Gina with at that time?

"A. Yes."

On October 8, 1975, Lawson filed an affidavit with the court detailing his efforts to find Gina and stating that he was unable to find her. On the same day the court issued an order for the grandparents to

"* * * appear before this court within 24 hours of the date of service of this Order upon them and show cause if any, why the bond heretofore filed by them should not be forfeited * * *."

The grandparents were personally served with the order on October 14, 1975.

On October 10, 1975, the grandparents' attorney filed a "Motion for Withdrawal for Order to Show Cause." This motion was repeated on October 14. At a hearing on October 20, the court stated that the grand-

parents' "motion to reconsider the order to show cause" was denied. The court also told the grandparents' attorney:

"Here is what I am going to do, I'm going to continue this matter until Wednesday morning at 9:00 o'clock or 9:30 and that would be 48 hours and you had better have your clients here to make their explanation at that time, Mr. Ramirez and I would certainly listen to it and if they did in fact deliver the child to the Children's Services Division, why, they have nothing to worry about."

And:

"Well, you can convey to your clients the verbal order made that they produce the child Wednesday morning, October [22], whatever it will be, the day after tomorrow at 9:30 or show cause why they shouldn't be held in contempt and their bond forfeited."

At the hearing of October 22, the grandparents' attorney represented to the court that he had not been able to contact his clients to notify them of the court's order of October 20. The court stated:

"* * * I am satisfied that Mr. and Mrs. Bloise, Sr. are apparently secreting the child as a ward of this Court and I am not inclined to tolerate. I am not completely satisfied as to all of the proceedings that have gone on here so the order that I am going to make today is this that the Bloise Sr.'s, both of them Mr. and Mrs. are ordered to produce that child before this Court at 9:00 a.m. on Monday morning and failing to produce the child the Court will order that the bond will be forfeited at 9:01 a.m. What I'm simply saying to you Mr. Ramirez is if they fail to appear and if the bond is forfeited on Monday morning and if their failure is because of the fact of some good substantial reason, they were unable to be contacted by you or something of that nature I would at a later date entertain a motion to remit the forfeiture."

In the course of the October 22 proceedings the court signed and filed an "Order to Produce Child or Forfeiting Bond," which stated:

"IT IS HEREBY ORDERED, that GEORGE BLOISE SR., and DIXIE BLOISE shall produce GINA BERNICE BLOISE physically before the undersigned Judge in the above-entitled Court at the Klamath County Courthouse,

Main Street, Klamath Falls, Oregon, at 9:00 in the morning of October 27, 1975 or in the event of their failure to produce said child at said time, their bond on file with this Court in the amount of $7,500.00 shall be forfeited at 9:01 in the morning of said date."

On October 28, the court signed and filed an "Order to Show Cause Re: Contempt," which stated:

"* * * [T]he undersigned Judge directed Glenn D. Ramirez [the grandparents' attorney] to contact both Bloises' if he could and advise them to appear with the child, Gina Bernice Bloise, on this date; based upon the statements of Glenn D. Ramirez in open Court that George Bloise Sr. was advised by Glenn D. Ramirez personally of the Order of this Court October 22, 1975, and that he has failed to appear before this Court this date; the undersigned finds that George Bloise Sr. and Dixie Bloise are wilfully secreting the child, Gina Bernice Bloise, or assisting in the secreting of said child and from the aforementioned findings; the Court further finds that George Bloise Sr. and Dixie Bloise are in contempt of this Court and that an Order to Show Cause for the arrest of George Bloise Sr. and Dixie Bloise should issue forthwith and an Order should be entered forfeiting the bond filed by George Bloise Sr. and Dixie Bloise in the amount of $7,500.00 and on the Order to Show Cause to be issued that a warrant shall issue for the arrest of George Bloise Sr. and Dixie Bloise and that there shall be no bail pending a hearing before this Court."

The grandparents contend that the court erred in entering its orders of October 8, 22 and 28, 1975, and in ordering their arrest.

■ The grandparents argue that the court erred in entering the show cause order of October 8, 1975 because they had produced the child for the meeting of September 17 and that thereafter the control of the child was in the stepmother. That is an argument the grandparents could have made at the October 20 hearing, but it does not support their contention that the October 8 show cause order should not have been issued.

■ The grandparents insist that the October 22 order was without basis because the stepmother had the

child. We cannot accept this contention because the grandparents had the opportunity, on October 20 and October 22, to prove that they could not produce the child and they failed to do so. Furthermore, the grandparents made no showing of impossibility of compliance at the hearing of October 27.

■ There is substantial evidence to support the trial court's finding on October 28, 1975 that the grandparents were "* * * *wilfully* secreting the child, Gina Bernice Bloise, or assisting in the secreting of said child * * *." (Emphasis supplied.) Thus, the court, by implication, found against the contention now urged by the grandparents — that they could not comply with the court's order.

ORS 33.150 provides:

"Either party to a judgment in a proceeding for a contempt may appeal therefrom, *in like manner and with like effect as from a judgment in an action,* but the appeal shall not stay the proceedings in any other action, suit or proceeding, or upon any judgment, decree or order therein, concerning which or wherein such contempt was committed." (Emphasis supplied.)

The Supreme Court stated in *Lloyd Corporation v. O'Connor,* 258 Or 33, 36, 479 P2d 744 (1971):

"In a law action tried by the court without a jury, the court's findings have the force and effect of a jury verdict and must be affirmed on appeal if supported by any substantial evidence. * * *"

Hence the question narrows to whether there was any substantial evidence to support the court's finding that the grandparents wilfully disobeyed the court's order. We conclude that there is such evidence. The grandparents had been awarded the physical custody of Gina; they were therefore responsible to CSD and the court for the child. It appears from the evidence that the grandmother herself approved the step-mother's staying with the girl while the grandmother went to get her husband three blocks away. During that brief time the stepmother was apparently acting on behalf of the grandparents.

The evidence also showed that the stepmother stayed with Gina in a car in front of the courthouse until the grandparents returned; the grandparents were last seen in the car directly behind the stepmother. From this there is substantial evidence that the grandparents continued their control of the child and were therefore in contempt for failure to produce the child.

■ The grandparents contend that Lawson's affidavit should have set forth a "time and place" when they failed to produce Gina. Such specifications were not necessary since the affidavit was in support of the "show cause" order issued October 8, 1975 and served on the grandparents October 14, 1975 to which they failed to respond.

Finally, the grandparents contend that the court had no jurisdiction in the contempt proceedings because, in the court below, the name of the State of Oregon had not been added as a party plaintiff as required by ORS 33.040 which provides:

> "In cases other than those mentioned in ORS 33.030, *before* any proceedings can be taken therein, the facts constituting the contempt must be shown by an affidavit presented to the court or judicial officer, and thereupon such court or officer may either make an order upon the person charged to show cause why he should not be arrested to answer, or issue a warrant of arrest to bring such person to answer in the first instance. The affidavit shall set forth the facts constituting the contempt, but need not contain recitals of matters already appearing in the record of any action, suit or proceeding in which the person charged with contempt has been personally served with process. It shall be sufficient *if the name of the State of Oregon be added as a party plaintiff in the affidavit and proceedings following it,* without any action of the district attorney, and without any proceedings for adding such party." (Emphasis supplied.)

■■ Omission of the state as a party renders the affidavit, i.e., complaint, demurrable. *Taylor v. Gladden,* 232 Or 599, 604, 377 P2d 14 (1962). However, the error on which the grandparents rely is not jurisdic-

tional; rather it is a defect in a party plaintiff (ORS 16.260(4))[1] which must be asserted by demurrer or it is waived. *Pulkrabek v. Bankers' Mortgage Corp.,* 115 Or 379, 386, 238 P 347 (1925). Such demurrer was not presented in this case.

Affirmed.

**SCHWAB, C. J.,** specially concurring.

I concur in the result.

The majority treats this case as though the contempt involved were "secreting" a child. That is understandable, since the trial court's order so recites. However, in my opinion, this language in the trial court's order was surplusage; the actual contempt involved was failure to appear despite repeated orders to appear.

Under this analysis, the majority's lengthy discussion of whether there is substantial evidence of wilful "secreting" becomes irrelevant. The order was to appear. The violation was failure to appear. Whether or not there was "secreting" has nothing to do with punishment of the contempt of nonappearance.

Finally, contrary to the majority's assumption, I am not sure that ORS 33.040 is applicable to a failure to appear. A tardy appearance has been held to be in the immediate presence of the court, i.e., an occurrence the court witnesses. *In Re Farquhar,* 492 F2d 561 (DC Cir 1973). Would not a total nonappearance equally be in the presence of the court, i.e., a nonoccurrence which the court witnesses?

---

[1]

"The defendant may demur to the complaint within the time required by law to appear and answer, when it appears upon the face thereof:

"* * * * *

"(4) That there is a defect of parties, plaintiff or defendant;

"* * * * *." ORS 16.260.

**FORT, J.,** concurring.

While I agree with Chief Judge Schwab's view that the essence of the contempt here was in the failure of the Bloises to appear after service of the order to show cause, I believe that with respect to the forfeiture of the $7,500 bond ordered, matters relating to the secreting of the child were relevant and necessary to a determination that that portion of the order forfeiting the bond, which was conditioned upon the production of the child before the court, was proper.